James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRUHAVEN ENTERPRISES, INC. d/b/a FIORINO RISTORANTE, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHUBB LTD, and INDEMNITY INSURANCE COMPANY OF NORTH AMERICA<br><br>Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Truhaven Enterprises, Inc. d/b/a Fiorino Ristorante ("Plaintiff"), by way of Complaint against Defendants Chubb Ltd. and Indemnity Insurance Company of North America (together "Defendants" or "Chubb"), alleges as follows:

### INTRODUCTION

1.     On March 11, 2020 World Health Organization Director General Tedros Adhanom Ghebreyesus declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing

this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

2.      On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[2]

3.      Following this advice for individuals to adopt far-reaching social distancing measures, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19. As a result, many governmental entities entered civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals. Currently, almost all states within the United States have issued some sort of "stay-at-home" order and ordered private non-essential business operations to close.

4.      The result of these far-reaching restrictions and prohibitions has been catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who

---

[1]      *See*      https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the- media-briefing-on-COVID-19 11-march-2020

[2]      https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

5.      Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

6.      Defendants, and most insurance companies who have issued all- risk commercial property insurance policies with business interruption coverage, are denying the obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures put in place by the civil authorities to stop the spread of COVID-19 among the population.  This action seeks a declaratory judgment that affirms that the COVID-19 pandemic and the corresponding response by civil authorities to stop the spread of the outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders.

7.      In addition, this action brings a claim against Defendants for their breach of their contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiffs and others similarly situated for business losses and extra expenses, and related losses

resulting from actions taken by civil authorities to stop the human to human and surface to human spread of the COVID-19 outbreak.

8.      Plaintiffs bring this action on behalf of a proposed class of policyholders who paid premiums in exchange for an all-risk commercial property insurance policy that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of one of the Defendants.

10.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that Defendants do business in this District and thus reside in this District, in accordance with 28 U.S.C. §1391(c).

## PARTIES

11.      Plaintiff Truhaven Enterprises, Inc. d/b/a Fiorino Ristorante is a New Jersey corporation with its principal place of business in Summit, New Jersey.  Fiorino Ristorante is a dine-in restaurant in Summit, New Jersey whose success depends on patrons being able to consume the products offered at the restaurant in that facility.

12.      Defendant Chubb Ltd is a Swiss corporation with its principal place of business in Zurich, Switzerland.  It owns subsidiaries, directly and indirectly, that issue, among other things, property insurance.

13.      Defendant Indemnity Insurance Company of North America is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.   Defendant

Indemnity Insurance Company of North America is a subsidiary of Chubb Ltd. (together "Chubb") and is duly qualified and licensed to issue insurance in the State of New Jersey.

14.     Chubb issued to Plaintiff Policy No. MCRD38180216 for the policy period between September 15, 2019 and September 15, 2020 (the "Policy").

15.     Plaintiff has paid the policy premiums to Chubb specifically to provide coverages for coverage of lost business income and extra expenses in the event of an involuntary business interruption.

## FACTUAL BACKGROUND

### A.     The Global COVID-19 Pandemic

16.     Viruses of the family Coronaviridae, such as Middle East respiratory syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life since at least 2002 and were identified in several animal hosts.[3]

17.     In December 2019, an initial cluster of nine patients with an unknown cause of viral pneumonia was found to be linked to the Huanan seafood market in Wuhan, China, where many non-aquatic animals such as birds were also on sale.  However, one of the patients never visited the market, though he had stayed in a hotel nearby before the onset of the illness.[4]

---

[3]     *See*     https://www.cdc.gov/coronavirus/2019-ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf (There are four genera of CoVs: (I) α-coronavirus (alphaCoV), (II) β-coronavirus (betaCoV) probably present in bats and rodents, while (III) δ-coronavirus (deltaCoV), and (IV) γ-coronavirus (gammaCoV) probably represent avian species)

[4]     *See* https://www.mdpi.com/1660-4601/17/8/2690 (As a typical RNA virus, the average evolutionary rate for coronaviruses is roughly 10–nucleotide substitutions per site per year, with mutations arising during every replication cycle. This finding suggests that 2019-nCoV originated from one source within a short period and was detected rapidly. However, as the virus transmits to more individuals, constant surveillance of mutations arising is needed.) *See* Lu R, Zhao X, Li J, et al. Genomic characterisation and epidemiology of 2019 novel coronavirus: implications for virus origins and receptor binding. Lancet (London, England). 2020 Feb;395(10224):565-574.

18.    By January 2020, genetic sequencing from patient samples was conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the pneumonia cluster.[5]  SARS-CoV-2 is an RNA virus, with a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope.  Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[6]

19.    The first confirmed case of the virus outside China was diagnosed on January 13, 2020 in Bangkok, Thailand with the number of cases exceedingly increasing worldwide.  On January 30, 2020, the World Health Organization (WHO) declared the SARS-COv-2 outbreak constituted a public health emergency of international concern, and by February 11, 2020, the virus was named "COVID-19" by the WHO Director-General.[7]  As of April 15, 2020, the WHO reports a confirmed 1.9 million cases of COVID-19 globally and over 123,000 deaths, with the United States dealing with more than 578,000 confirmed cases and 23,000 deaths - more than any other country.[8]

20.    The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care

---

DOI: 10.1016/s0140-6736(20)30251-8. (This finding suggests either possible droplet transmission or that the patient was infected by a currently unknown source. Evidence of clusters of infected family members and medical workers has now confirmed the presence of human-to-human transmission.)

[5]      https://www.mdpi.com/1660-4601/17/8/2690

[6]      *See*     https://www.mdpi.com/1660-4601/17/8/2690 (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes—30–32 kb—with a 50 -cap structure and 30 -poly-A tail.)

[7]      https://www.mdpi.com/1660-4601/17/8/2690

[8]      https://covid19.who.int/

unit (ICU). Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[9] There are no specific treatments recommended for COVID-19, and no vaccine is currently available; so understanding the complexities of COVID-19 is ongoing.[10]

21.    It has now been discovered by scientists that COVID-19 has several modes of transmission. Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[11] Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual. Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic people to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[12]

---

[9]    *See*  https://www.mdpi.com/1660-4601/17/8/2690 (Asymptomatic infections have also been described, but their frequency is unknown...Other, less common symptoms have included headaches, sore throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (e.g., nausea and diarrhea) have also been reported, and in some patients they may be the presenting complaint.)

[10]    *See*  https://www.mdpi.com/1660-4601/17/8/2690 (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection. Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock [37]. Different strategies can be used depending on the severity of the patient and local epidemiology [38,39]. Home management is appropriate for asymptomatic or paucisintomatic patients. They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.)

[11]    https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

[12]    *See* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of

22.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.[13] During this period, also known as the "presymptomatic" period, some infected persons can be contagious. For that reason, transmission from a pre-symptomatic case can occur before symptom onset.  Presymptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[14]

23.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may occur.[15]

24.     Not only is COVID-19 transmitted via human-to-human, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces. According to a study by scientists documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on

---

the COVID-19 virus is highest in upper respiratory tract (nose and throat) early in the course of the disease. That is, within the first 3 days from onset of symptoms. Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.)

[13]     https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

[14]     *See*   https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 could transmit the virus before significant symptoms develop.)

[15]     https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

cardboard, and up to two to three days on plastic and stainless steel.[16]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic.

25.      Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can remain infectious on inanimate surfaces at room temperature for up to nine days.[17] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter. Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[18]  Though this study was not conclusive on COVID-19 itself, scientists are still grappling to understand this implication.

26.      On March 27, 2020, the Centers for Disease Control and Prevention ("CDC") released a report entitled *"Public Health Responses to COVID-19 Outbreaks on Cruise Ships -*

---

[16]  *See*  https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *See*       https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (In the context of COVID-19, airborne transmission may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.)

[17]      *See*        https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3

[18]      *See*        https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation it seem plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate patient surrounding where the highest viral load can be expected. The WHO recommends "to ensure that environmental cleaning and disinfection procedures are followed consistently and correctly.")

*Worldwide, February - March 2020."*[19]  The report detailed that during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and 10 deaths.[20]  Of the individuals tested, a high proportion were found to be asymptomatic, which may explain the high rates on cruise ships.  What is interesting about this study though, is that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[21]  The CDC notes that more studies are required to understand the perpetuation of transmission, but what is clear is the

---

[19]     https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w

[20]     *See*    https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w
(During February 7–23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3 (*3*). On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons aged ≥65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.)

[21]     *See*    https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w
(Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine/ On the Grand Princess, crew members were likely infected on voyage A and then transmitted SARS-CoV-2 to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew...Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of SARS-CoV-2 aboard cruise ships is warranted.)

uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses

27.     Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human to human and surface to human exposure. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[22] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[23]

28.     The secondary exposure of the surface to humans is particularly acute in places where the public gathers typically to socialize, eat, drink, shop, be entertained, and go for recreation. This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into close proximity of people with the virus or surfaces where the virus may reside. However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing non-essential business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the population. This has caused the cancelation of sporting events, parades, and concerts, the closure of

---

[22]     https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html

[23]     *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, Vol. 104, Kemp., G., et al., Journal of Hospital Infection, No. 3, March 2020, pages 246-251 (remains infectious from 2 hours to 28 days depending on conditions); see also https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (doorknobs and table tops can contain the virus); https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

amusement parks, and substantial travel restrictions. In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

29.     New Jersey was among the first states to declare a state of emergency, with Gov. Phil Murphy declaring a state of emergency and a public health emergency on March 9, 2020.  The declaration allowed the State to direct state resources to affected communities, and prohibited excessive price increases on goods and services.  On March 16, 2020, Gov. Murphy, in conjunction with New York Governor Andrew Cuomo and Connecticut Governor Ned Lamont, ordered that as of 8 p.m. that evening, all gyms, movie theaters, bars, and casinos were to be closed. Restaurants were limited to take-out and delivery orders only (the "Closure Order").  Separately, Gov. Murphy ordered all schools to close.[24]  On March 21, 2020, Gov. Murphy issued a "stay at home" order, ordering New Jersey residents to stay at home except for necessary travel and mandated that all non-essential businesses close until further notice.

30.     Since that time, Plaintiff, as well as all other restaurants in New Jersey, have been unable to operate in the ordinary course of business.

**B.      Defendants' Standard Uniform All-Risk Commercial Property Insurance Policies**

31.     Chubb's insurance policies issued to Plaintiff and the Class Members are "all risk" commercial property policies that cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

---

[24]     https://www.nj.com/coronavirus/2020/04/murphy-has-issued-24-executive-orders-to-help-slow-coronavirus-outbreak-in-nj-heres-the-timeline.html

32.     Plaintiff and Class Members do not participate in the drafting or negotiating of their policies with Chubb.

33.     Plaintiff's Policy, as well as the policies of other Class Members, include standard forms used by Chubb for all insureds having applicable coverage.  The form policies are used by Chubb subsidiaries Indemnity Insurance of North America, Bankers Standard Insurance Company, Ace American Insurance Company, Ace Property and Casualty Company, Insurance Company of North America, Pacific Employers Insurance Company, Ace Fire Underwriters Insurance Company, and Westchester Fire Insurance Company.

**C.**     **Plaintiff's Factual Allegations**

34.     Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits if its business was shut down.

35.     The Business Income (And Extra Expense) Coverage Form, Commercial Property form CP 00 30 10 12 in the Policy provided coverage for Plaintiff as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

36.     In the same form, the Policy provided the following additional coverage for Plaintiff:

5.     Additional Coverages

a.     Civil Authority

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations. When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)      Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2)      The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1)      Four consecutive weeks after the date of that action; or

(2)      When your Civil Authority Coverage for Business Income ends;

whichever is later

37.      The Business Income (And Extra Expense) Coverage Form defines Business Income as:

a.      Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.      Continuing normal operating expenses incurred, including payroll.

38.      The Business Income (And Extra Expense) Coverage Form defines Extra Expense as:

necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused

by or resulting from a Covered Cause of Loss. We will pay Extra Expense (other than the expense to repair or replace property) to:

(1)     Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2)     Minimize the "suspension" of business if you cannot continue "operations". We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

39.     Causes of Loss are defined in a separate form of the Policy, Commercial Property form CP 10 30 09 17.  A Covered Cause of Loss "means direct physical loss unless the loss is excluded or limited in this policy."  The interruption of Plaintiff's and other class members' businesses was were not caused by any of the exclusions set forth in the Causes of Loss – Special Form.

40.     Plaintiff's Policy includes an endorsement Exclusion of Loss Due To Virus or Bacteria, Commercial Property form CP 01 40 07 07, which provides:

We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

41.     Plaintiff and all similarly situated Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

42.     On or about April 1, 2020, Chubb posted a notice on its website regarding to coverage under Chubb policies relating to the COVID-19 pandemic.[25]  With respect to business interruption insurance, the notice stated:

---

[25]     https://www.chubb.com/microsites/covid19-resource-center/_assets/pdf/covid-commercial-property-policyholder-notice-4-1-2020.pdf

Business interruption insurance generally covers losses to your business' income that result from disruption of your business. The disruption must be caused by physical loss or damage to your property by a "covered peril." The presence of an infectious agent or communicable disease at a location where there is covered property **generally will not mean that property has suffered "physical loss or damage" under your policy.** Generally, "physical loss or damage" means that the physical structure or physical characteristics of the property have been altered by a "covered peril". Loss of use, or diminished value of property that has not been physically altered will not be considered "physical loss or damage", except for theft, and then only if theft is listed as a covered cause of loss or covered peril under your policy. These disruptions must result from physical loss or damage to property by a "covered peril":

1) at listed locations; or

2) within a certain distance from a listed location, if a civil authority prohibits access to that location due to the physical loss or damage ("civil authority" insurance); or

3) at a location operated by third parties, if your business depends on that location or on those third parties. This could include your customers, direct suppliers, or attractions that bring customers to your business ("contingent business interruption" insurance).

Business interruption insurance may pay your loss of income, necessary expenses such as payroll, and extraordinary expenses you incur to attempt to continue your business, such as hiring temporary workers or paying overtime.

You may also have "supply chain insurance" - insurance for interruption of business activities due to physical loss or damage to property by a "covered peril" at other locations that are part of your supply chain but not included in your "contingent business interruption" insurance, such as suppliers of direct suppliers.

Your business interruption insurance and your limits for this insurance will be indicated in your policy.

Business interruption insurance applies after a "waiting period" which usually consists of a set period of consecutive hours or days immediately after physical loss or damage occurs. Business interruption insurance then continues through a "period of indemnity" which is the time it takes to repair or replace the lost or damaged property and restore business activities to pre-loss levels. Waiting periods and periods of indemnity can vary by location and type of business interruption insurance. All of these time periods will be in your policy.

You may have purchased insurance for the costs to clean up property contaminated by infectious diseases if required to do so by a civil authority. This insurance is offered in limited circumstances and generally will not require physical loss or damage to property, is offered in limited circumstances, will be subject to a separate

limit of insurance, and includes insurance for business income losses incurred during the cleanup.

(Emphasis in original)

43.     Following the notice on Chubb's website, by way of letter dated April 14, 202, Chubb denied Plaintiffs' claim for business interruption insurance, taking the position that Plaintiffs' premises had not suffered direct physical loss or damage for purposes of that coverage and that no surrounding property had suffered direct physical loss or damage or for purposes of the Civil Authority coverage.  Chubb also denied coverage based upon the Virus and Bacteria endorsement.

44.     Both the notice and Chubb's denial letter were erroneous in that in that Plaintiff had suffered direct physical loss or damage within the definition of the Policy.  It is contrary to law, as Chubb states on its website, that "[l]oss of use, or diminished value of property that has not been physically altered will not be considered 'physical loss or damage'". In fact, applicable case law holds that loss of use of property that has not been physically altered does constitute "physical loss or damage" for purposes of first-party property insurance, such as that contained in the Policy.

45.     As drafter of the Policy, if Chubb had wished to exclude from coverage as "physical loss or damage" loss of use of property that has not been physically altered, it could have used explicit language stating such a definition of "physical loss or damage".  It did not do so.

46.     The exclusion in the Virus and Bacteria endorsement does not apply because Plaintiff's, and other class members', losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease". Rather, the efficient proximate cause of Plaintiff's, and other Class Members' losses, were  precautionary measures taken by the State of New Jersey to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiff's insured property.

D.     **The COVID-19 Pandemic has Affected Policyholders Nationwide**.

47.     COVID-19 is physically impacting private commercial property in New Jersey and throughout the United States, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

48.     All but six states have enacted "stay-at-home" orders, thirty-five states have closed all non-essential businesses with other states enacting measures to curtail business operations, all fifty states have closed schools, and all but one state has closed restaurants and bars for services other than take-out and delivery.[26]

49.     No insurer intends to cover any losses caused by the COVID-19 pandemic.

50.     For example, a bipartisan group from the U.S. House of Representatives recently sent a letter to various insurance industry trade groups requesting that their members recognize financial losses relating to COVID-19 under the standard commercial interruption coverage. In response, the industry trade groups stated: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[27] Upon information and belief, Chubb belongs to and supports the trade groups' position.

51.     In addition, many state departments of insurance have issued advisories to business owners that COVID-19 is not an insured peril and there will be no coverage for business interruption. This is disinformation being published to discourage business owners from filing claims.

---

[26]      https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[27]      https://www.insurancejournal.com/news/national/2020/03/20/561810.htm

52.     For instance, Arkansas Insurance Department Bulletin No. 9-2020 states that "In most BII policies, coverage is triggered when the policyholder sustains physical damage to insured property caused by a covered peril resulting in quantifiable business interruption loss . .   . viruses and disease are typically NOT an insured peril unless added by endorsement (emphasis in the original).[28]

53.     The South Carolina Department of Insurance issues "Guidance" on business interruption insurance stating that under the business income policy, there likely is no coverage from losses resulting from a virus.[29]

54.     Members of the insurance industry have also been actively advising Insurance Commissioners that they do not intend to provide coverage for business interruption related to COVID-19. As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses because the insurance industry is stating that such policies do not cover COVID-19.

55.     For instance, the State of Connecticut Insurance Department, Maryland Insurance Administration and the West Virginia Office of the Insurance Commissioner issued nearly identical notices supporting the insurance companies' reasons for denying business interruption claims, stating that the potential loss costs from such perils [like COVID-19] are so extreme that providing coverage would jeopardize the financial solvency of property insurers.[30]

---

[28]        https://insurance.arkansas.gov/uploads/resource/documents/9-2020.pdf
[29]        https://www.doi.sc.gov/948/COVID-19

[30]        *See*     https://portal.ct.gov/CID/Coronavirus/Business-Interruption-Insurance-Notice; https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020256; https://www.wvinsurance.gov/Portals/0/pdf/pressrelease/20-08%20Business%20Interruption%20Insurance.pdf?ver=2020-03-26-222830-620.

56.     John F. King, Insurance and Safety Fire Commission for the State of Georgia issued Bulletin 20-EX-3 stating that losses from COVID-19 are excluded losses.[31] Vicki Schmidt, Kansas Insurance Department Commission issued a similar Bulletin stating it was her "understanding it is unlikely that a business policy would cover losses related to COVID-19."[32]

57.     Other state governments expect that insurance companies will breach their obligation to provide coverage for business losses due to the COVID-19 pandemic and have introduced bills requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.[33]

58.     A declaratory judgment determining that the business income loss and extra expense coverage provided in common all-risk commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent the Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons similarly situated.

60.     The Nationwide Class is defined as:

---

[31]     https://www.oci.ga.gov/ExternalResources/Announcements/Bulletin-3172020-1619.pdf.

[32]     https://insurance.ks.gov/documents/department/COVID19-FAQ.pdf.
[33]     *See* House Bill No. 858, State of Louisiana House of Representatives. Similar legislation has been introduced in Massachusetts (Senate Bill Senate Docket. 2888); New Jersey (Assembly No. 3844); Sate of New York (Assembly 10226); and Ohio (House Bill No. 589).

All entities who have entered into standard all-risk commercial property insurance policies with Chubb, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities to stop the spread of COVID-19.

The New Jersey Sub-Class is defined as:

All entities who have entered into standard all-risk commercial property insurance policies with Chubb to insure property in New Jersey, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities to stop the spread of COVID-19.

Excluded from each class are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

61.     Plaintiff reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

62.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

63.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Chubb sells many insurance policies in the State of New Jersey and most, if not all, other states and therefore joinder of the Class members is impracticable.

64.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Chubb's or their agent's books and records. Plaintiff anticipates providing appropriate notice to the certified Class in compliance with Fed.R.Civ.P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed.R.Civ.P. 23(d).

**Typicality**

65.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Chubb. Each Class member's insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's Policy will address the rights and obligations of all Class members.

**Adequacy of Representation**

66.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies. Plaintiff has no interests antagonistic to or in conflict with other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

67.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(2) because there are questions of law and fact that are common to each of the classes. These common questions

predominate over any questions affecting only individual Class members. The questions of law and fact common to the Class include, but are not limited to:

a.  Whether there is an actual controversy between Plaintiff and Chubb as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

b.  Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and the Class members standard all-risk commercial property insurance policies;

c.  Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to covered commercial property;

d.  Whether Chubb has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage; and

e.  Whether Plaintiff and the Class members suffered damages as a result of the anticipatory breach by Chubb.

**Superiority/Predominance**

68.    This action satisfies the requirements of Fed.R.Civ.P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the vast number of Class members who have entered into the standard all-risk commercial property insurance policies with Defendants.

69.    Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Chubb, by even a small fraction of the Class members, would be enormous.

70.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties,

and far more effectively protects the rights of each Class member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is superior to other alternatives under Fed.R.Civ.P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

71.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## <u>COUNT I</u>
### DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
(Claim Brought on Behalf of the National Class and New Jersey Subclass)

72.     Plaintiff repeats the allegations set forth in paragraphs 1-70 as if fully set forth herein.

73.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

74.     Plaintiff's Chubb Policy, as well as those of the other Class Members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

75. Plaintiff and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Chubb or Chubb is estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

76. Chubb has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

77. An actual case or controversy exists regarding Plaintiff's and the other Class Members' rights and Chubb's obligations under the Policies to reimburse Plaintiff and Class Members for the full amount of Business Income losses incurred by Plaintiff and the other Class Members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

78. Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

i. Plaintiff's and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii. Chubb is obligated to pay Plaintiff and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## COUNT II
### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE
**(Claim Brought on Behalf of the National Class and New Jersey Subclass)**

79.     Plaintiff repeats the allegations set forth in paragraphs 1-77 as if fully set forth herein.

80.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

81.     Plaintiff's Chubb Policy, as well as those of the other Class members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

82.     In the Business Income (And Extra Expense) Coverage Form, Chubb agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

83.     In the Business Income (And Extra Expense) Coverage Form, Chubb agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. A "partial slowdown or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Chubb agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 24 consecutive months after the date of direct physical loss or damage."

84.     "Business Income" under the policy means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll"

85.     The Closure Order caused direct physical loss and damage to Plaintiff's and the other Class Members' Covered Properties, requiring suspension of operations at the Covered

Properties. Losses caused by the Closure Order thus triggered the Business Income provision of Plaintiff's and the other Business Income Breach Class Members' Chubb policies.

86.     Plaintiff and the other Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by Chubb or Chubb  estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

87.     By denying coverage for any Business Income losses incurred by Plaintiff and other Class Members as a result of the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Chubb has breached its coverage obligations under the Policies.

88.     As a result of Chubb's breaches of the Policies, Plaintiff and the other Class Members have sustained substantial damages for which Chubb is liable, in an amount to be established at trial.

<div align="center">

**COUNT III**
**ANTICIPATORY BREACH OF CONTRACT— BUSINESS INCOME COVERAGE**
**(Claims Brought on Behalf of the National Class and the New Jersey Sub-class)**

</div>

89.     Plaintiff repeats the allegations set forth in paragraphs 1- 87 as if fully set forth herein.

90.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

91.     Plaintiff's Chubb Policy, as well as those of the other Class members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

92.    In the Business Income (And Extra Expense) Coverage Form, Chubb agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

93.    In the Business Income (And Extra Expense) Coverage Form, Chubb agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. A "partial slowdown or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Chubb agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 24 consecutive months after the date of direct physical loss or damage."

94.    "Business Income" under the policy means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll"

95.    The Closure Order caused direct physical loss and damage to Plaintiff's and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the Closure Order thus triggered the Business Income provision of Plaintiff's and the other Business Income Breach Class Members' Chubb policies.

96.    Notwithstanding the foregoing, the notice on Chubb's website states that Chubb will pay business interruption claims only if the subject property is physically altered.  As a result, Chubb has anticipitorally breached the Policy of Plaintiff and other Class members who have suffered physical loss or damage to their property because the use of that property has been substantially impaired and, thus, would be entitled to coverage under their Policies under applicable law, but for Chubb's anticipatory breach of contract.

97.     Plaintiff and the other Class Members have complied with all applicable provisions of their policies and/or those provisions have been waived by Chubb or Chubb  estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

98.     As a result of Chubb's breaches of the Policies, Plaintiff and the other Class Members have sustained substantial damages for which Chubb is liable, in an amount to be established at trial.

<div align="center">

**COUNT IV**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the National Class and New Jersey Subclass)**

</div>

99.     Plaintiff repeats the allegations set forth in paragraphs 1-97 as if fully set forth herein.

100.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

101.    Plaintiff's Chubb Policy, as well as those of the other Class Members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and other Class members' losses for claims covered by the Policy.

102.    Plaintiff and Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Chubb or Chubb is estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

103. Chubb has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

104. An actual case or controversy exists regarding Plaintiff's and other Class Members' rights and Chubb's obligations under the Policies to reimburse Plaintiff and other Class Members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class Members in connection with Closure Order and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

105. Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class Members seek a declaratory judgment from this Court declaring the following:

i.   Plaintiff's and other Class Members' Civil Authority losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

ii.  Chubb is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Order and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

## COUNT V
### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
**(Claim Brought on Behalf of the National Class and New Jersey Subclass)**

106. Plaintiff repeats the allegations set forth in paragraphs 1-104 as if fully set forth herein.

107. Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

108. Plaintiff's Policy, as well as those of the other Class Members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the policy.

109.    Chubb Business Income (And Extra Expense) Coverage Form provides "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)    Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2)    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

110.    The Closure Order triggered the Civil Authority provision under Plaintiff's and the other members of the Class' Chubb Policies.

111.    Plaintiff and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Chubb or Chubb is estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

112.    By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Chubb has breached its coverage obligations under the Policies.

113.    As a result of Chubb's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Chubb s liable, in an amount to be established at trial.

**COUNT VI**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and New Jersey Subclass)**

114.    Plaintiff repeats the allegations set forth in paragraphs 1-112 as if fully set forth herein.

115.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and the New Jersey subclass.

116.    Plaintiff's Chubb Policy, as well as those of other Class Members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and other Class Members' losses for claims covered by the Policy.

117.    Plaintiff and other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Chubb or Chubb is estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

118.    Chubb has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

119.    An actual case or controversy exists regarding Plaintiff's and other Class Members' rights and Chubb's obligations under the Policies to reimburse Plaintiff and the other Class Members for the full amount of Extra Expense losses incurred by Plaintiff and Class Members in connection with Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID- 19 pandemic.

120.    Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class Members seek a declaratory judgment from this Court declaring the following:

i.      Plaintiff's and other Class Members' Extra Expense losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming

from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii.      Chubb is obligated to pay Plaintiff and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## COUNT VII
## BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (Claim Brought on Behalf of the National Class and New Jersey Subclass)

121.    Plaintiff repeats the allegations set forth in paragraphs 1-119 as if fully set forth herein.

122.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and New Jersey Subclass.

123.    Plaintiff's Chubb policy, as well as those of the other Class Members, are contracts under which Chubb was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policy.

124.    In the Business Income (And Extra Expense) Coverage Form, Chubb also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

125.    Due to the Closure Order, Plaintiff and other members of the Class incurred Extra Expense at Covered Property

126.    Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Chubb or Chubb is

estopped from asserting them, and yet Chubb has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

127.    By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Chubb has breached its coverage obligations under the Policies.

128.    As a result of Chubb's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Chubb is liable, in an amount to be established at trial.

**WHEREFORE**, Plaintiff, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Fed.R.Civ.P. 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class;

(2)    Issuing a Declaratory Judgment declaring the Parties' rights and obligations under the insurance policies;

(3)    Awarding Plaintiff and the Class compensatory damages from Chubb's breach of the insurance policies in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4)    Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

(5)    Awarding such other and further relief the Court deems just, proper, and equitable.

CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:_____/s/ James E. Cecchi_____
          JAMES E. CECCHI

Dated: April  20, 2020

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000

## DEMAND FOR A JURY TRIAL

Plaintiff and the Class request a jury trial for all Counts for which a trial by jury is permitted by law.

<div style="margin-left: 50%;">

CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
     JAMES E. CECCHI

</div>

Dated: April 20, 2020

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

Samuel H. Rudman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
  & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000